Good morning. The first case that we have this morning is 19-1341 Kawahara v. Guaranty Bank and Trust. Counsel for the appellant, please make your appearance and proceed. Thank you, your honor. May it please the court, my honorable opponent, I'm Blaine Myrie, counsel for appellant Keiko Kawahara. Ms. Kawahara was a vice president of retail banking for until her termination in November of 2016 that was ostensibly part of a reduction in force by Guaranty Bank. She brought claims under the Age Discrimination and Employment Act, Title VII for race and gender discrimination as well as retaliation under both statutes. The district court granted summary judgment concluding that she could not show evidence of pretext with regard to the reduction in force and that is what we contend is reversible error. I'd like to address the race and gender discrimination claims first and then separately address the age discrimination case claims second because it's a little different situation than the race and gender claims. The parties seem to agree that the issue for this claim. We believe on this record that Ms. Kawahara can show sufficient evidence that as to her termination, the reduction in force was a pretextual reason for her discharge. I think there's a couple critical facts related to that. One is the identity of the decision maker. The decision maker who decided to terminate Ms. Kawahara as part of the reduction in force was her immediate supervisor, Mr. DiPetro. Mr. DiPetro had testified or excuse me had said to Ms. Kawahara that he was told he could get rid of whoever he wanted to. So I think it's pretty clear on the record viewed in the light most favorable to her that it was Mr. DiPetro's decision to make. And there's evidence in the record that indicates that Mr. DiPetro seems to or may favor white males over others employees. There was evidence in the record that Mr. DiPetro had asked Ms. Kawahara to improperly manipulate data with regard to three white male managers in order for them to receive bonuses that they otherwise would not have been entitled to. Wasn't it within his discretion to determine who got a bonus and who didn't? I don't think the record is clear on that, Your Honor, but Ms. Kawahara's view was that she was asked to manipulate the data in a way that was not consistent with what the numbers showed in terms of getting a performance bonus. I'm sorry, I thought she even said or Mr. DiPetro said that he could have given a bonus to anybody he wanted. I mean, doesn't the record, one of the two said that, I'm pretty sure as I recall that. I think you're correct, Your Honor, but I think that Ms. Kawahara said that in her view it was improper. And I think that that would be up for a jury to decide whether it was improper or not and whether he was being honest and additional evidence that's helpful is that he was upset when a female manager received a performance bonus. Which could mean he didn't like the female manager. I mean, that whole episode, there was nothing explicit in that episode that suggested that that was based upon anything other than perhaps favoritism, which is not unlawful. I mean, there was no reference to gender in that communication as far as I recall from the record. It was just he said something like it sucks that the female manager got the bonus and he wanted to make an adjustment. Why would a jury, a reasonable jury, infer from that necessarily that there was a gender basis to it? Well, I think it's a question of whether the jury views Mr. DiPetro as having a bias against someone, whether it's called favoritism or bias, an implicit bias based on gender or based on race. Favoritism is not unlawful. Favoritism is not unlawful unless it rests on race, gender, or some other protected class. Correct. I would also point out that with regard to Mr. DiPetro, that there was evidence that with regard to this situation with the CRA loans, the Community Reinvestment Act loans, where Ms. Kawahara said that, first of all, that the people in sort of the inner circle of the bank that were dealing with this loan program referred to the low income. But that, to me, shows that there is a view of minorities as lower income and suggests that there is some animus there. And she raised that with Mr. DiPetro, not only in that meeting, but according to her deposition testimony, they had that conversation. She raised it with him three or four times. And can I ask you about that? I mean, that's an important point that I want to I didn't see anywhere in the record where it was clear. She said three or four times. I got that. But when did she do that? And when did she do that relative to the February 2015 teleconference, where she apparently talked to Mr. DiPetro right after that? When are these three or four times? Well, unfortunately, Your Honor, the record doesn't say. I think the way her testimony reads, it was she first raised it in that meeting and then subsequently raised it after, but the record does not say when those other conversations were. Well, isn't that a problem for you on the retaliation claim? Because I mean, you've got to establish in some sense that there was some causal link between her supposed protected activity and her riff. And if all you've got is the February 2015 teleconference, when supposedly she said something after that, and you can't put your finger on when the other three or four are, the other three or four could have been in March 2015. And that wouldn't help you for a dispute for a riff that took place in July 25, 2016, would it? I agree, Your Honor. And with regard to the retaliation claims, it does make the retaliation claim more difficult because of the case law regarding a causal connection and temporal proximity. But I'd like to return to the race and gender claims and talk about this that her position was eliminated. Her position was not eliminated on November 30, 2016. It may not have been eliminated on that particular date, but it was certainly part of the riff. And it was certainly part of the overall handling of the business. You're not suggesting that the riff is pretext, are you? I'm suggesting that her termination as part of the riff was pretext. I'm not saying the entire riff itself is pretextual. I'm saying her replacement by Mr. Mallon, a white male. Well, he was the senior vice president, too, was he not? He was the senior vice president, yes. In the other company. In the other company, right. And he stepped into her duties completely. She had to train him. And what he said when they were talking and when they were training, she asked him, so you are taking over my responsibility. I said, and this is Ms. Carbajal speaking, so you are taking over responsibility. And he said, yes, as far as I know, I am. So I think a jury could conclude that he was terminated two months or three months later because of the same reason. Well, you're right. Didn't they automate the system? And wasn't that the. They were in the process of automating the system, Your Honor. And that was what Mr. Mallon did, essentially the same job that Ms. Kawahara did until that position was ultimately eliminated, which appears to be around April 1st, 2017. But Ms. Kawahara was not her position was not at her termination. Her position survived her termination. For two or three months. For a period of about four months. Okay. Counsel, the person who replaced her, the record suggests that he did more than just her job, that he absorbed her duties for this period of months. But he didn't take her job.  Well, he absorbed her entire job. He absorbed her. Well, he didn't take her title, did he? You don't have that in the record. No, I don't have that in the record, Your Honor. As far as I know, he retained his title as senior VP, but I don't think the record's clear on that. And you do admit that that he also continued to perform other duties than the duties that she performed. I believe that he did have other duties, but I can't recall what they were. But he did subsume all of her duties. And on this record, I think the jury could conclude that he took her job. Now, he may have had additional responsibilities, but I think a reasonable jury based on this evidence could conclude that he was brought in to replace her and that her position was not eliminated. And I think that- Let's talk about that. Let's just hypothetically speak about that. If you have two positions, one of them is held by the senior vice president, one of them is held by your client, and your client is let go and the senior vice president takes over both jobs, doesn't that necessarily indicate that her position was eliminated? One of the positions is eliminated. Certainly, he's not occupying two positions, is he? Your Honor, I'm not clear what his position was. He was the senior vice president of Home State Bank. They're in the middle of a merger and acquisition, and he steps in to replace her. And then he remains, as far as I know, at Guarantee Bank after April 1st, 2017. But then her position is eliminated because everything has been automated with the exception of one duty. So, I think the record is sufficient that he took her job, and he may have had another duties beyond that, but her job was still in place at the time of her termination. You don't discuss the Pippin case or the Pippin factors at all, do you? We do address Pippin in the reply brief, and I think, you know, that the difference with Pippin is here you had multiple reasons why the plaintiff in Pippin couldn't sustain his claim, including poor performance. We don't have that here. Well, take it from the top. Does her termination accord with the RIF criteria? The guy was told he had to save a million dollars, and this is how he chose to do it. There's also record evidence that he said he could do whatever he wanted. So, in that sense, the criteria could be pretextual. Was your criteria that he could do whatever he wants unless the client didn't want him to do it? No, but he said to Ms. Kawahara, the COO said I could get rid of whoever I wanted, and he would support me. That seems like pretty broad, discretion. I am so puzzled by why you infer that there's something unlawful or nefarious about that. I thought the understanding was he had a million dollars he had to cut from his budget, and basically they gave him full discretion on how he did that. What is unlawful about that? Then he goes about deciding who's necessary and who's not. He decides whose job can be automated and whose job can't be automated. I mean, that's what people do in business every day. That's correct, Your Honor, but I would submit that on this record, a jury could conclude that Mr. Mallon replaced her, her position was not terminated, and therefore that she has met her prima facie case, and it should go to a jury. Let me just drill down on one quick point, and then I don't want to delay you too much. On this, if ultimately her duties were automated, why doesn't that validate that the RIF did exactly what it said it was going to do? I mean, in other words, when he came into the job, pieces of her job started going away, and then they ultimately disappeared. That's exactly what they said they were going to do. Well, Your Honor, but that could have been done with Ms. Kawahara in that position, and the fact that they had to replace somebody and have her trained suggests that it was favoritism in favor of a white male in order to get rid of her. I'm saying it's a jury question based on this record. I'd like to reserve the remaining seconds for rebuttal. Good morning. Good morning. May it please the Court, my name is Michelle Muehlhaisen on behalf of the Apelli Defendant Guarantee Bank and Trust Company. Ms. Muehlhaisen, why don't you pick up on the last point, which is the question of why should we not infer some discriminatory animus given that there was a essentially four-month period during the automation in which instead of keeping her in place, they brought in someone else? Why wouldn't a reasonable jury infer from that some bias in favor of white males? Yeah, absolutely. So the argument seems to be that there is at least a showing of pretext on its face and not to go to the jury because the bank lied about eliminating Ms. Kawahara's job. In other words, they brought in this white male, Scott Mullan, to replace her. The key here, and we talked about it a bit already, is that there is a difference between a position being eliminated and all job duties being eliminated. So in this case and in every case where there's a merger between two companies and a resulting riff, it's not uncommon. In fact, it's very common for companies to have to decide we might have two similar positions at different companies. In the context of cuts that need to be made, the elimination of one position at Company X and the decision to retain, whether it's forever or for a four-month period, the decision to retain a position at Company Y to assume some job duties of that position that was eliminated, there's nothing wrong with that. There's nothing nefarious about it, and certainly nothing that supports a finding of pretext. And then the next point I want to make on that is, Mr. Meyer, the argument again is that because Mullan was there for four months, it means that her position was not eliminated, that they chose Mullan, a white male, over her. But what it's important to point out here is, of course, not only does that four-month period, an incredibly short period of time, and as Judge Holmes pointed out, after her primary job duties were automated, Mr. Mullan's position was also eliminated. But there is also very clear evidence in the record to support why Mike DiPietro decided to keep Scott Mullan for that four-month period over Ms. Kawahara. And that reasoning was, he was the senior vice president at Homestate Bank. He had been with that bank for almost 20 years, from the time it was one branch, and then, as time passed, to many branches. There is testimony in the record that Scott Mullan was the equivalent of Mike DiPietro at Homestate Bank. In other words, Scott Mullan was the senior VP. Mike DiPietro was the executive VP. And, of course, you can never make this comparison perfectly. It's not an apples-to-apples comparison. But Guaranteed Bank and Homestate Bank both believed that Scott Mullan was the equivalent of the Mike DiPietro. He was more senior than Ms. Kawahara. And it was necessary that he stay for that four-month period to help with the synchronization between the retail banking operations of both banks. I want to jump back a little bit. Is there any evidence that this RIF criteria had been falsified in order to terminate her? No. And backing up a little bit, Ms. Kawahara was the Vice President of Retail Banking at Guaranteed Bank for about nine years. During that nine-year period, she reported to the same person, Mike DiPietro. She was a good employee. That is not disputed. She got great performance reviews by Mike every year. She was never issued a single disciplinary or corrective action. The only thing that changed in that nine-year period was that Guaranteed Bank merged with Homestate Bank. And this was a big merger. After the merger happened, this became the biggest Colorado-based bank statewide. I mean, this was huge. It was valued at $140 million. So this is the only thing that changed in that nine-year period, but there were never any complaints by Ms. Kawahara about Mike DiPietro, about any discriminatory conduct directed at her during her entire nine years until that RIF meeting. And I'd like to jump to her concerns raised about the CRA loan program. And as I believe it was Judge Holmes that pointed out, there is nothing in the record to show, even if we take what he says as true, which of course we do right now, she said in a high-level context that she made a February 2015 call to Mike DiPietro and said that the CRA loan program was not right. It's not right is what she said. And she consistently said that at her deposition testimony. She never claimed at her deposition that she alleged that the CRA loan program was illegal. The first time that those complaints were made were at her deposition. And also in the investigation by the bank after the RIF meeting, after Ms. Kawahara was told that her position was being eliminated, she at that point did say that the CRA loan program was discriminatory towards minorities, right? Unspecified minorities. And there's also those applications submitted in connection with the CRA loan program didn't even identify the race of the applicant. It did change over time. I do believe at some point there might have been an identification. Well, that generally gets you so far because I mean, if the point is that they stereotype those loans as being minority loans, then whether they identify them or not, they could act on that stereotype and making their determination, right? Okay. Ms. Kawahara alone said that a bank employee or maybe multiple bank employees, I'm not sure, referred to the CRA loan program as a minority program as opposed to a low to moderate income. That was Nancy Taylor. That is Ms. Kawahara. Yeah. That's what she said. That was Ms. Kawahara's claim. Correct. There was no evidence by any other bank employee to support that. In fact, the overwhelming testimony went the other way. What was interesting is from the record, it appears that Ms. Kawahara got her view that there was some illegality going on from Nancy Taylor as it relates to the CRA loans. As far as I could read the record, she didn't have any independent basis to believe it was unlawful. She relied upon what Nancy Taylor told her. Did I read that correctly? Yes, I believe so. I think the key here though is that these complaints about the CRA loan program allegedly being illegal and or discriminatory did not come up unequivocally based on Ms. Kawahara's testimony. Those complaints did not come up until after she was told that her position was being eliminated. What does that get you? I mean, if she did it, I mean, if it were in fact true, I mean, all that means is she didn't complain about discrimination prior to the act. I mean, that gives you some inference that she is late to party making it up, but that doesn't mean it's not true, right? Understandably, Judge Holmes, at the summary judgment phase when we were briefing this, we did take Ms. Kawahara's testimony as true. Again, we deny that, but for purposes of summary judgment, we did take it as true. The point is when we're taking those allegations as true and we're looking at them in the context of discrimination claims and retaliation claims, what she is saying alone is not enough to support a case and raise a question of fact to take those claims to the jury. And in the context of the discrimination claim, as Judge Blackburn pointed out, complaints about the CRA loan program being not right or even illegal, or even if you assume, which isn't supported by the record, that Ms. Kawahara said that the CRA loan program was discriminatory towards minorities, that is not enough to show, to raise a question of fact that Ms. Kawahara was discriminated against because of her race or her national origin. Well, it could raise an inference that the organization or there were people in the organization who harbored a racial animus. I mean, if that was the acts that they were taking towards others, it's only one step removed that they weren't taking those acts towards her. I mean, particularly if she communicated that to Mr. DiPetro and he turned away from it. Mm-hmm. Well, I think, and I think Judge Blackburn said this very well. He said, there is a logical disconnect between Ms. Kawahara's generalized complaints about discrimination against unspecified minorities and an inference of discriminatory animus against women, Asian, or older workers. Well, I took your hypothetical and I didn't hear your answer, taking your hypothetical that she actually expressed some more expressed statements about being discriminatory. If she in fact did, and in fact, that was the case, then why would not contribute to an inference that she herself was discriminated against? If I can take it into another example. I'm using your example. Yeah. Okay. And your example, it seems to me, gives you a problem, because why wouldn't there be an inference that came from them? Yeah. So I think the short answer is because she is raising concerns about discrimination or a discriminatory animus directed at some unspecified class of minorities. Ms. Kawahara is Asian. So raising a general complaint that this bank is treating some unspecified class of minorities unfairly as part of the CRA loan program is not enough to raise a question of fact as to a Title VII discrimination claim that Ms. Kawahara was discriminated against because of her race and national origin. Well, that's what you're saying. I'm just not clear necessarily why that would be so. But let me ask you this question. Is there anything in the record that I missed where she did anything more explicit vis-a-vis Mr. DiPetro than say it's not right? I didn't see anything, and that's fairly enigmatic to make that statement that it's not right. Not right in what context is what one is led to wonder. Is there anything where she said not right because that I missed in the record? Yeah. The only way that she expanded on what she meant by it's not right, and to your point, she said that repeatedly at her deposition three or four times. That's how she summarized her call with Mike DiPetro was saying it's not right. The only way that she expanded on that at her deposition testimony during her sworn testimony was to express her disagreement with the fact that the bank put a $7,500 cap on home improvement loans. There was very clear testimony from the bank that the reason those caps were put in place was because it was based on the applicant's income, their credit score, legitimate reasons that had nothing to do with their race or national origin. Again, the race and national origin was unknown for most of these applications. The concern that she expressed was that $7,500 or $5,000, whatever it was, not enough for someone to make improvements to their home. Nothing about race or national origin. Counsel, just to button this up from what I've been hearing you discuss with Judge Holmes, did she tell DiPetro that people were calling the loans minority loans? I know she's saying that now, but when she complained to him, did she ever go to him and say, Mike, they're calling these minority loans and that's discriminatory and that's wrong? No. Okay. One other thing I would like to go back to, the concern that Ms. Kawahara raised about Mike DiPetro allegedly manipulating numbers to give white men bonuses. There's no evidence other than her own testimony to support that. But more importantly, Ms. Kawahara admitted at her deposition that she got a bonus. In other words, Mike DiPetro gave her a bonus every single year that she reported to him. Oh, that only gets you so far. That may mean that he decided to be nice to her. That doesn't mean that he didn't across the board favor white males over females, right? Well, I think the reason I'm putting that out is because in this case, we are talking about Ms. Kawahara's standalone unsupported claim that this manipulation of reports happened. And because there's no evidence of that, I do think it is important to point out that the actual evidence in the record does confirm that she herself got a bonus every year. Could I ask on this no evidence point, was there anything in documentary evidence related to these bonuses that somebody could point to? There was a bonus plan that Mike DiPetro was following every single year that bonuses were being awarded. I'm not certain that that's in the summary judgment record or the record on this appeal, but there was a bonus plan which was testified to and that is in the record on appeal. Okay, Jones, would you indulge me for one quick question? Of course. Uh, Council, as far as the bonuses go and in the in the plaintiff receiving a bonus, did she complain that she received an insufficient? I mean, obviously, she testified she got a bonus. Did she think it was insufficient? Did she say it should have been uh, the argument of appellant, please? Ms. Anderson? I'm sorry, Ms. Anderson, could you give him 38 seconds? All right, please proceed. Thank you. In my quick 38 seconds, when it comes to the question of pretext, the ultimate question is, is the reason given unworthy of belief? The question is, is the riff pretext? Right, but the reason given is the riff as to her termination unworthy of belief, and we believe that on this record, with the evidence of Mr. DiPetro's favoritism of white males and of her replacement by Mr. Scott Malin and the fact that her job was not eliminated upon her termination supports a reversal of summary judgment, and we would ask the court to do so. Is there any documentary evidence that supports her statement about the manipulation of bonuses? I don't believe so, Your Honor, but it was in connection with her working under his supervision. All right, thank you. Thank you, Council. I appreciate it. The argument's case is submitted.